KATRINA A. PAGONIS (No. 262890)
Email: kpagonis@hooperlundy.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
44 Montgomery Street, Suite 3500
San Francisco, CA 94105
Telephone: (415) 875-8500
Facsimile: (415) 986-2157

KELLY A. CARROLL
Email: kcarroll@hooperlundy.com
ROBERT L. ROTH
Email: rroth@hooperlundy.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
401 9th Street, NW, Suite 550
Washington, D.C. 20004
Telephone: (202) 580-7700
Facsimile: (202) 609-8931

SVEN C. COLLINS
Email: scollins@hooperlundy.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
999 18th Street, Suite 3000
Denver, CO 80202
Telephone: (720) 687-2850

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SOUTHERN CALIFORNIA HEALTHCARE SYSTEM, INC. dba SOUTHERN CALIFORNIA HOSPITAL AT HOLLYWOOD fka HOLLYWOOD COMMUNITY HOSPITAL; TENET HEALTH SYSTEM, GB, INC., dba ATLANTA MEDICAL CENTER, <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, in his official capacity as Secretary, United States Department of Health and Human Services, <br><br> Defendant. | Case No. <br><br><br> **COMPLAINT** <br><br><br><br><br><br><br> Trial Date:     None Set |

**HOOPER, LUNDY & BOOKMAN, P.C.**
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL (202) 580-7700 • FAX (202) 609-8931

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8951

1   Plaintiffs Southern California Hospital at Hollywood and Tenet Health

2   System, GB, Inc., dba. Atlanta Medical Center ("the Hospitals"), by and through

3   their undersigned attorneys, brings this action against defendant Xavier Becerra, in

4   his official capacity as Secretary ("the Secretary") of the Department of Health and

5   Human Services of the United States Department of Health and Human Services

6   ("HHS"), and state as follows:

7   **I.    <u>STATEMENT OF THE CASE</u>**

8   1.    This action arises under Title XVIII of the Social Security Act, 42

9   U.S.C. §§1395 *et seq.* (the "Medicare Act"), and the Administrative Procedure Act

10  ("APA"), 5 U.S.C. §§551 *et seq.*  The issue in this action is whether, for Federal

11  Fiscal Year ("FFY") 2014, the Secretary unlawfully adopted and implemented a

12  policy that excluded from the calculation of the Hospitals' Medicare

13  Uncompensated Care Disproportionate Share Hospital ("UC DSH") payment the

14  uncompensated care data from hospitals that had merged into each of the Hospitals

15  for Medicare payment purposes before the beginning of FFY 2014.  How much UC

16  DSH payment a hospital receives is based on a determination of how much

17  uncompensated care the hospital is expected to provide in the coming FFY.  That

18  determination is based on statistics showing of how much uncompensated care the

19  hospital actually provided during a past year.  Because the Hospitals continued to

20  operate the hospitals they had subsumed, the Secretary's failure to include the data

21  from the merged hospitals in the calculation of uncompensated care that the

22  Hospitals were expected to provide caused the Hospitals' FFY 2014 UC DSH

23  payments to be understated by more than $7 million.

24  2.    The exclusion of the merged hospital data was substantively unlawful

25  under the UC DSH statute and other authorities for several reasons including, most

26  importantly, because the exclusion was *ultra vires* and contrary to the fundamental

27  purpose of the UC DSH payment, which is to compensate hospitals for

28  "uncompensated care" provided to "uninsured" patients based on the amount of the

1   care that the hospital was expected to provide in FFY 2014.  The intentional

2   exclusion of the merged hospital data indisputably and artificially caused each of the

3   Hospitals' FFY 2014 UC DSH payments not to reflect all of the uncompensated

4   care that the Hospitals were expected to provide in FFY 2014 and ultimately did

5   provide.

6          3.     The Secretary's policy undergirding the exclusion of the merged

7   hospital data was also procedurally unlawful under the Medicare Act, the APA, and

8   other authorities, for several reasons, including that the Secretary, acting through the

9   Centers for Medicare & Medicaid Services ("CMS"), the agency within HHS that is

10  responsible for administering the Medicare program, (a) departed from long-

11  standing agency policy and applied the new policy for the first (and only) time in

12  FFY 2014, (b) did not provide notice about the possible imposition of this new

13  policy or an opportunity to comment, as required by the APA and the Medicare Act,

14  or even a reasonable explanation for the policy, or adopt the policy in a regulation

15  through notice-and-comment rulemaking, (c) did not meet the requirement that the

16  new policy, which was presented for the first time in a final rule, be the logical

17  outgrowth of what was presented in an antecedent proposed rule, and (d) when

18  confronted about the lack of rationality of the policy, reversed it for FFY 2015 and

19  all subsequent FFYs, but unreasonably refused to correct the FFY 2014

20  underpayments.

21         4.     When the Hospital appealed to obtain its proper FFY 2104 UC DSH

22  payment, the administrative review tribunal, the Provider Reimbursement Review

23  Board ("PRRB"), dismissed the appeal for lack of jurisdiction, finding that Congress

24  allegedly had precluded administrative review of CMS's action in 42 U.S.C.

25  §1395ww(r)(3) (the "Review Preclusion Statute").  The PRRB's jurisdictional

26  dismissal is unlawful and must be reversed because *inter alia* Congress did not (and

27  could not Constitutionally and otherwise) preclude review of an agency policy that

28  was not lawfully established, and thus *ultra vires*, because of procedural flaws and

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

1  substantive inconsistencies with the underlying statute and other substantive

2  shortcomings.

3      5.    Where a court reverses an administrative decision denying jurisdiction

4  in a Medicare payment appeal, the next step often is to remand the matter back to

5  the agency for a decision on the merits of the underlying payment dispute.  Such a

6  remand is inappropriate here because, when dismissing a similar appeal for lack of

7  jurisdiction under the Review Preclusion Statute, the PRRB stated that it lacks the

8  authority to grant the kind of relief sought here.  Thus, if this Court were to reverse

9  the PRRB's unlawful jurisdictional dismissal and remand this action back to the

10  Secretary, the Secretary would remand it to the PRRB, which would order

11  "expedited judicial review," thus causing the action to be back in U.S. District Court

12  without any further agency action and without the agency ever having addressed the

13  merits after all.  Moreover, if this Court were to reverse the PRRB's unlawful

14  jurisdictional dismissal, CMS has all of the information that it needs to calculate and

15  pay the amount due to the Hospitals and, thus, there are no facts that need to be

16  resolved by the PRRB, making remand futile.

17      6.    Based on the foregoing, the Hospitals respectfully ask that the Court (a)

18  vacate the PRRB's jurisdictional dismissal, (b) find that the PRRB had jurisdiction

19  over the Hospitals' appeal, and (c) order the Secretary to recalculate the Hospitals'

20  FFY 2014 Medicare UC DSH payments and pay the amounts owed, with the

21  statutory interest required under 42 U.S.C. §1395oo(f)(2).

22  **II.**    **JURISDICTION AND VENUE**

23      7.    This Court has jurisdiction under 42 U.S.C. §1395oo(f) (appeal of final

24  Medicare program agency decision) and 28 U.S.C. §§1331 (federal question) and

25  1361 (mandamus).

26      8.    Venue lies in this judicial district under 42 U.S.C. §1395oo(f) and 28

27  U.S.C. §1391.

28

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

## III.   PARTIES

9.     Plaintiff Southern California Hospital at Hollywood (Medicare Provider No. 05-0135) is an acute-care hospital located in Los Angeles, California. At all times relevant to this action, the Hospital was qualified as a Medicare-participating, general acute-care hospital-provider under the federal Medicare program pursuant to the Medicare Act.

10.    Plaintiff Tenet Health System, GB, Inc., dba. Atlanta Medical Center (Medicare Provider No. 11-0115) was an, acute-care hospital located in Atlanta, Georgia.  At all times relevant to this action, the Hospital was qualified as a Medicare-participating, general acute-care hospital-provider under the federal Medicare program pursuant to the Medicare Act.

11.    Defendant Xavier Becerra is the Secretary of HHS.  The Secretary, the federal official responsible for administration of the Medicare program, has delegated that responsibility to CMS.  Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA").  In this complaint, the Hospitals refer to the agency as CMS.

## IV.   GENERAL STATUTORY AND REGULATORY BACKGROUND

### A.   General Background of the Medicare Program

12.    The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease.  42 U.S.C. §1395c.  The Medicare program is federally funded and administered by the Secretary through the CMS and its contractors.  42 U.S.C. §1395kk; 42 Fed. Reg. 13,282 (Mar. 9, 1977).

13.    CMS implements the Medicare program, in part, through the issuance of official Rulings.  *See* 42 C.F.R. §401.108.  In addition to the substantive rules published by the Secretary in the Code of Federal Regulations and the Rulings, CMS publishes numerous other interpretative rules implementing the Medicare program, which are compiled in one or more CMS Manuals.  The Secretary also issues other subregulatory documents to implement the Medicare program, which

1  generally do not have the force and effect of law.

2      14.    The Medicare Act, at 42 U.S.C. §1395hh(a), prohibits the application

3  of any rule or policy that establishes or changes a substantive legal standard

4  governing the payment for service unless it is promulgated by the Secretary by

5  notice-and-comment rulemaking.  Specifically, the Secretary is required to

6  "prescribe such regulations as may be necessary to carry out the administration" of

7  the Medicare program.  42 U.S.C. §1395hh(a)(1).  Further:

8      No rule, requirement, or other statement of policy (other than a national
   coverage determination) that establishes or changes a substantive legal
9      standard governing the scope of benefits, the payment for services, or
   the eligibility of individuals, entities, or organizations to furnish or
10     receive services or benefits under this subchapter shall take effect
   unless it is promulgated by the Secretary by regulation under paragraph
11     (1).

12  42 U.S.C. §1395hh(a)(2).  In addition, the Medicare Act specifies that where a final

13  rule "is not a logical outgrowth of a previously published notice of proposed

14  rulemaking . . ., such provision shall be treated as a proposed regulation and shall

15  not take effect." 42 U.S.C. §1395hh(a)(4).

16      15.    The Medicare program is divided into five parts: A, B, C, D, and E.

17  Part A of the Medicare program provides for coverage and payment for, among

18  others, inpatient hospital services on a fee-for-service basis.  42 U.S.C. §§1395c et

19  seq.  Part A services are furnished to Medicare beneficiaries by "providers" of

20  services, including the Hospital, that have entered into written provider agreements

21  with the Secretary, pursuant to 42 U.S.C. §1395cc, to furnish hospital services to

22  Medicare beneficiaries.

23      16.    CMS pays providers participating in Part A of the Medicare program

24  for covered services rendered to Medicare beneficiaries through "Medicare

25  Administrative Contractors" ("MACs"), which are agents of the Secretary.  Each

26  Medicare-participating hospital is assigned to a MAC.  42 U.S.C. §1395h.  The

27  amount of the Medicare Part A payment to a hospital for services furnished to

28  Medicare beneficiaries is determined by its MAC based on instructions from CMS.

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

### B.   Medicare Inpatient Prospective Payment System

17.     Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted the hospital inpatient prospective payment system ("IPPS") to reimburse hospitals, including the Hospital, for inpatient hospital operating costs.

18.     Under IPPS, Medicare payments for hospital operating costs are not based directly on the costs actually incurred by the hospitals.  Rather, they are based on predetermined, nationally applicable rates based on the diagnosis of the patient determined at the time of discharge from the inpatient stay, subject to certain payment adjustments.  One of these adjustments is the Medicare "disproportionate share hospital" or "DSH" payment.  *See* 42 U.S.C. §1395ww(d)(5)(F).

### C.   Medicare DSH Adjustment

19.     Hospitals that treat a disproportionately large number of low-income patients are entitled by statute to a DSH adjustment, in addition to standard Medicare payments.  42 U.S.C. §1395ww(d)(5)(F).  Congress enacted the DSH adjustment in recognition of the relatively higher costs associated with providing services to low-income patients.  These higher costs have been found to result from the generally poorer health of low-income patients.  The DSH adjustment provides additional Medicare reimbursement to hospitals for the increased cost of providing services to their low-income patients and a hospital that qualifies for DSH payments is known as a "DSH hospital."

20.     There are two methods of determining qualification for a DSH adjustment: the more common "proxy method" (42 U.S.C. §1395ww(d)(5)(F)(i)(I)) and the less common "Pickle method" (42 U.S.C. §1395ww(d)(5)(F)(i)(II)).  The Hospitals' DSH calculations were made using the proxy method, under which entitlement to a DSH adjustment, as well as the amount of the DSH payment, is based on the hospital's "disproportionate patient percentage" ("DPP").  42 U.S.C. §1395ww(d)(5)(F)(v) and (vi).

21.     The DPP is the sum of two fractions, which are designed to capture the

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL (202) 580-7700 • FAX (202) 609-8931

HOOPER, LUNDY & BOOKMAN, P.C.
401 9ᵀᴴ STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

number of low-income patients a hospital serves on an inpatient basis by counting the number of days that low-income patients receive inpatient services in a given fiscal year ("inpatient days").  Thus, the two fractions serve as a "proxy" to determine low-income patients, rather than having CMS count the actual number of such patients.

22.     The first fraction, referred to as the "Medicaid fraction," is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible* for medical assistance under a State plan approved under title XIX, but who were *not entitled to benefits under Part A of this title*, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi)(II) (emphasis added).  The Medicaid fraction, therefore, is intended to account for hospital inpatients "who were not entitled to benefits under [Medicare] Part A," but who were "eligible for medical assistance" under a Medicaid State plan at the time that they were receiving inpatient services at the hospital.

23.     The second fraction, referred to as the "Medicare/SSI fraction," accounts for inpatients who are current Medicare Part A recipients and also entitled to benefits under SSI, a federal low-income supplement.   The Medicare/SSI fraction is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) *were entitled to benefits under Part A of this subchapter* and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) *were entitled to benefits under Part A of this subchapte*r.

42 U.S.C. §1395ww(d)(5)(F)(vi)(I) (emphasis added).  The Medicare/SSI fraction, therefore, is the percentage of a hospital's Medicare Part A-entitled inpatients who were also entitled to SSI benefits at the time that they were receiving inpatient

7

7576724.1

1  services at the hospital.

2  **D.** **UC DSH Payment**

3  24.    Congress enacted the UC DSH payment system in §3133 of the Patient

4  Protection and Affordable Care Act ("ACA").  42 U.S.C. §1395ww(r); *see also* 42

5  CFR 412.106(f)-(h).  The purpose of the UC DSH payment is to compensate DSH

6  hospitals for "uncompensated care" provided to "uninsured" patients.  Thus,

7  beginning with FFY 2014, a DSH hospital received two separate DSH payments.

8  The first payment, known as the "traditional DSH payment," is 25% of the amount

9  due to the hospital under the historical DSH methodology.  The second payment,

10 known as the "UC DSH payment," is the hospital's share of 75% of the amount of

11 the national total traditional DSH payment, with each DSH hospital's specific share

12 calculated using the new methodology in ACA §3133.

13 25.    Under the new methodology in ACA §3133, CMS calculates the UC

14 DSH payment for each DSH hospital based on three factors, the first two of which

15 establish the aggregate amount of UC DSH payments that CMS will make to all

16 DSH hospitals for the coming FFY, and the third of which establishes each DSH

17 hospital's individual share of the aggregate UC DSH payments.  This methodology

18 is codified at 42 U.S.C. §1395ww(r)(2).  Factor 1 is 75% of CMS's estimate of the

19 traditional DSH payments that otherwise would have been made to all DSH

20 hospitals for the coming FFY if there were no UC DSH payments.  *See* 42 U.S.C.

21 §1395ww(r)(2)(A).  Factor 2 is an adjustment to reflect CMS's estimate of the

22 percentage change in the national uninsured rate for "the most recent period for

23 which data is available" as compared with a baseline uninsured rate for 2013, less a

24 small statutory reduction.  *See* 42 U.S.C. §1395ww(r)(2)(B).  Factor 3, which

25 estimates for each DSH hospital the amount of uncompensated care it provides

26 relative to the total uncompensated care provided by all hospitals, is set forth in the

27 statute as follows:

28 A factor equal to the percent, for each subsection (d) hospital, that

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

1

represents the quotient of—

2

(i) the amount of uncompensated care for such hospital for a period selected by the Secretary (as estimated by the Secretary, based on appropriate data (including, in the case where the Secretary determines that alternative data is available which is a better proxy for the costs of subsection (d) hospitals for treating the uninsured, the use of such alternative data)); and

3

4

5

(ii) the aggregate amount of uncompensated care for all subsection (d) hospitals that receive a payment under this subsection for such period (as so estimated, based on such data).

6

7

42 U.S.C. §1395ww(r)(2)(C).

8

9
26.     If a DSH hospital's uncompensated care is understated in Factor 3, its

10
percentage of "total uncompensated care" also will be understated.  Factor 3 is the

11
focus of this action because the exclusion of the data from the hospitals that were

12
merged into the Hospitals before FFY 2014 caused each Hospital's "amount of

13
uncompensated care" used to determine its percentage of "the aggregate amount of

14
uncompensated care for all [DSH] hospitals" for FFY 2014 to be too low, causing

15
each Hospital's FFY 2014 UC DSH payment to be too low.

16
27.     CMS calculates UC DSH payments in advance of each FFY as part of

17
the annual IPPS rulemaking using historical data.  By regulation, the UC DSH

18
payment is not reconciled with or revised based on data from the FFY for which the

19
payment is being made.  UC DSH payments for hospitals are posted on the CMS

20
IPPS rulemaking website.

21
28.     For FFY 2014, CMS elected to implement the UC DSH statute by

22
basing its calculation of each hospital's share of the UC DSH payment pool on the

23
ratio of a DSH hospital's combined inpatient Medicaid days and Medicare/SSI days

24
to the total calculation of such days for all DSH hospitals nationally, using historical

25
cost report data from the hospitals' audited Medicare cost reports for 2010 or 2011,

26
depending on which of those cost reporting periods yielded more recent data.  *See*

27
78 Fed. Reg. at 50,642.

28

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

7576724.1

1

### E.   UC DSH Review Preclusion Statute

2

29.   ACA §3133 includes the Review Preclusion Statute, codified at 42

3

U.S.C. §1395ww(r)(3), which states:

4

(3) Limitations on review.  There shall be no administrative or judicial

5

review under section 1395ff of this title, section 1395oo of this title, or otherwise of the following:

6

(A) Any estimate of the Secretary for purposes of determining the factors described in paragraph (2).

7

(B) Any period selected by the Secretary for such purposes.

8

The PRRB dismissed the Hospitals' appeal, finding that the Review Preclusion

9

Statute deprived it of jurisdiction over the Hospitals' otherwise properly filed PRRB

10

appeal.

11

### F.   PRRB Hearing Procedures and the Procedure for Administrative and Judicial Review of PRRB Decisions

12

13

30.   If a hospital is dissatisfied with a final determination as to the amount

14

of its Medicare IPPS payment, the hospital may appeal to the PRRB if it meets the

15

other requirements set forth in 42 U.S.C. §1395oo(a).  In addition to having the

16

authority to make substantive decisions concerning Medicare reimbursement

17

appeals, the PRRB is authorized to decide questions relating to its jurisdiction.  A

18

group of hospitals may bring such an appeal if the matter in controversy involves a

19

common question of fact or interpretation of law or regulations and the amount in

20

controversy is, in the aggregate, $50,000 or more.  42 U.S.C. §1395oo(b).

21

31.   The publication of UC DSH payments in the Federal Register in the

22

IPPS Final Rule constitutes a final determination that may be appealed to the PRRB

23

under this authority.

24

32.   The decision of the PRRB on substantive or jurisdictional matters

25

constitutes final administrative action unless the Secretary reverses, affirms, or

26

modifies the decision within 60 days of the hospital's notification of the PRRB's

27

decision.  The Secretary has delegated his authority under the statute to review such

28

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

1 decisions to the CMS Administrator.

2     33.    A hospital may obtain judicial review of a final administrative decision,

3 whether substantive or jurisdictional, by filing suit within 60 days of receipt of the

4 final action on the administrative appeal in the United States District Court for the

5 judicial district in which the hospital is located or in the United States District Court

6 for the District of Columbia. 42 U.S.C. §1395oo(f). In any such action, the

7 Secretary is the proper defendant because, under 42 C.F.R. §421.5(b), the Secretary,

8 acting through CMS, "is the real party of interest in any litigation involving the

9 administration of the [Medicare] program." Under 42 U.S.C. §1395oo(f)(2), interest

10 is to be awarded in favor of a hospital that prevails in an action brought under 42

11 U.S.C. §1395oo(f).

12     34.    Judicial relief is also available under the equitable remedy of

13 mandamus where a hospital has a clear right to the relief sought and the Secretary

14 has a defined and non-discretionary duty to honor that right. *City of New York v.*

15 *Heckler*, 742 F.2d 729 (2d Cir. 1984); *Monmouth Med. Ctr. v. Thompson*, 257 F.3d

16 807 (D.C. Cir. 2001).

17     **G.**    **The Administrative Procedure Act**

18     35.    Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review

19 after the Board dismisses an appeal for lack of jurisdiction "shall be tried pursuant to

20 the applicable provisions under chapter 7 of title 5" of the U.S. Code, which

21 contains the APA. Under the APA, a "reviewing court shall… hold unlawful and

22 set aside agency action, findings, and conclusions found to be…arbitrary,

23 capricious, an abuse of discretion, or otherwise not in accordance with law." 5

24 U.S.C. §706(2)(A). Furthermore, a "reviewing court shall…hold unlawful and set

25 aside agency action, findings, and conclusions found to be…in excess of statutory

26 jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.

27 §706(2)(C).

28     36.    Additionally, a "reviewing court shall…hold unlawful and set aside

agency action, findings, and conclusions found to be…without observance of procedure required by law." 5 U.S.C. §706(2)(D). The APA dictates rulemaking procedural requirements, specifically the requirement that the agency provides notice of proposed rulemaking, that the agency affords interested parties an opportunity to comment on the proposed rulemaking, and that the agency considers the relevant matters presented. 5 U.S.C. §553.

## V.  STATEMENT OF FACTS AND UC DSH REGULATORY AUTHORITIES

### A.  The Hospitals' FFY 2014 UC DSH Payments

37.  The cost reporting years at issue in this action for both of the Hospitals end on December 31. In contrast, FFY 2014 started on October 1, 2013, and ended on September 30, 2014. Thus, FFY 2014 overlaps with the Hospitals' Fiscal Years ending ("FYEs") December 31, 2013 and 2014 ("FYEs 12/31/13 and 12/31/14"). This Complaint challenges the Hospitals' Medicare payments for the portions of the Hospitals' FYEs 12/31/13 and 12/31/14 that coincide with FFY 2014 (*i.e.,* October 1 through December 31, 2013; and January 1 through September 30, 2014).

38.  As a result of a merger transaction, effective January 1, 2013, Plaintiff Atlanta Medical Center assumed the provider agreement of South Fulton Medical Center ("SFMC"), Provider No. 11-0219. SFMC was subsumed under the "surviving" hospital's (*i.e.*, Plaintiff Atlanta Medical Center's) CMS certification number ("CCN") going forward for Medicare payment purposes (SFMC's CCN was "retired" but not "terminated"). More important for purposes of the UC DSH payment, following the closing of the transaction, Plaintiff Atlanta Medical Center continued to operate the facility formerly owned by SFMC as it was operated by SFMC before the transaction (*i.e.*, as an acute care facility), including with regard to its provision of uncompensated care, with those services now being provided under Plaintiff Atlanta Medical Center's CCN.

39.  Similarly, a result of a merger transaction, effective January 1, 2013,

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

Plaintiff Southern California Hospital at Hollywood assumed the provider agreement of Brotman Medical Center ("BMC"), Provider No. 05-0752, which had merged into Southern California Hospital at Hollywood.  BMC was subsumed under the "surviving" hospital's (*i.e.*, Southern California Hospital at Hollywood's) CCN going forward for Medicare payment purposes (BMC's CCN was "retired" but not "terminated").  More important for purposes of the UC DSH payment, following the closing of the transaction, Plaintiff Southern California Hospital at Hollywood continued to operate the facility formerly owned by BMC as it was operated by BMC before the transaction (*i.e.*, as an acute care facility), including with regard to its provision of uncompensated care, with those services now being provided under Plaintiff Southern California Hospital at Hollywood's CCN.

40.   When calculating their FFY 2014 UC DSH payments, each of the Hospitals expected that CMS would include all relevant data from the hospitals they had subsumed (SFMC and BMC)  for Medicare payment purposes before the start of FFY 2014, because doing so would be consistent with, and was required by, (a) the agency's long-standing policy of calculating Medicare payments using combined data from hospitals that had merged for Medicare payment purposes where the surviving hospital assumed the Medicare provider agreement of the subsumed hospital and (b) the purpose of the UC DSH payment, which is to compensate hospitals for "uncompensated care" provided to "uninsured" patients based on the amount of the care that the hospital was expected to provide in FFY 2014.

41.   In the FFY 2014 IPPS Proposed Rule, published in the Federal Register on May 10, 2013 (78 Fed. Reg. 27,486 (May 10, 2013)), CMS announced its proposed methodology to calculate UC DSH payments for FFY 2014 without mentioning in either the preamble or the regulatory text any proposed deviation from the agency's long-standing policy of calculating post-merger Medicare payments using combined data from hospitals that had merged for Medicare

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

13

1   payment purposes.

2      42.   In the Medicare DSH-Supplemental Data table published with the FFY

3   2014 IPPS Proposed Rule, CMS listed (a) the historical Medicaid and Medicare/SSI

4   inpatient days that would be used for each hospital for the proposed Factor 3

5   calculation and (b) a projection as to whether a hospital would receive a UC DSH

6   payment for FFY 2014.  Notably, the Medicare DSH-Supplemental Data table

7   included UC DSH data for the Hospitals along with the data for their previously

8   merged counterpart hospitals (SFMC and BMC), including a calculation for all of

9   them of the percentage of the UC DSH payment pool amount.  This table properly

10  reflected the intent of Congress that, for Factor 3 purposes, CMS should account for

11  the UC DSH days provided at the hospital level for every DSH hospital, including

12  any DSH hospital that was subsumed into another DSH hospital before FFY 2014.

13     43.   Because the FFY 2014 IPPS Proposed Rule identified the Hospitals and

14  their merger counterparts (SFMC and BMC) as DSH hospitals that would receive

15  UC DSH payments, and because CMS did not provide notice in the FFY 2014 IPPS

16  Proposed Rule of any deviation from long-standing CMS policy of using combined

17  merged hospital data for Medicare payment purposes, the Hospitals had no reason to

18  comment on the use of merged hospital data in the calculation of their FFY 2014

19  UC DSH payments in the Proposed Rule.

20     44.   In the FFY 2014 IPPS Final Rule, published in the Federal Register on

21  August 19, 2013 (78 Fed. Reg. 50,496 (Aug. 19, 2013)), CMS, without prior notice

22  and opportunity for comment, dramatically cut UC DSH payments for hospitals,

23  such as the Hospitals, that had subsumed another DSH hospital through a merger,

24  but only if the merger was finalized during a very limited time period.  In the

25  preamble to the FFY 2014 IPPS Final Rule, CMS noted a comment on the FFY

26  2014 IPPS Proposed Rule, which CMS paraphrased as follows:

27         Two hospitals merged in 2011 with one surviving provider number.
           These hospitals had two cost reports and two SSI ratios in 2011.
28         However, in the proposed rule, CMS calculated Factor 3 using only the

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

surviving hospital's cost report data and SSI ratio data. The hospital submitted a public comment requesting that we account for the merger and include both hospitals' data in the calculation of the Factor 3 amount.

78 Fed. Reg. at 50,642. CMS issued the following ambiguous response to this comment in the preamble of the FFY 2014 IPPS Final Rule without addressing the issue raised by this comment in the text of any regulation adopted by the Final Rule:

Data associated with a CCN that is no longer in use are not used to determine [a hospital's Medicare DSH payment adjustment, CCRs for outlier payments, and wage index values] under the surviving CCN. Furthermore, data reported on the Medicare hospital cost report under the CCN associated with the old provider agreement would not necessarily be used to determine hospital payments for the CCN associated with the surviving provider agreement.

*Id.* Contributing to the ambiguity, CMS also stated "Factor 3 will be calculated based on the low-income insured patient days (that is, Medicaid days and SSI days) under the surviving CCN, based on the most recent available data for that CCN from the cost report for 2011 or 2010." *Id.*

45.     Based on this response, one possible (but legally unexpected) reading appeared to be that, in some instances where a merger occurred after the periods from which the calculation data was extracted, CMS could choose not to combine the data of two hospitals that merged into a single multi-campus provider for purposes of the Factor 3 calculation, even in instances where both hospitals were otherwise DSH-eligible. But this would be inconsistent with long-standing CMS policy under which CMS does not credit the surviving hospital with the subsumed hospitals data for Medicare payment purposes <u>only if</u> the surviving provider does not accept assignment of the subsumed hospital's Medicare provider agreement. This long-standing policy was designed by CMS to encourage a surviving hospital to accept assignment of the subsumed hospital's provider agreement for Medicare payments, thereby accepting the subsumed hospital's assets and any liabilities owed to Medicare. In connection with the Hospitals' respective acquisitions of SFMC and BMC, the Hospitals assumed the provider agreement of SFMC and BMC and, thus,

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

7576724.1

1  the Medicare liabilities of the subsumed hospitals.

2      46.    Thus, CMS unexpectedly, and also without the legally-required prior

3  notice, excluded the inpatient days from SFMC and BMC when calculating the

4  Hospitals' respective FFY 2014 UC DSH payments.  This policy change, which

5  CMS abandoned in FFY 2015, is referred to herein as the "FFY 2014 Merged

6  Hospital Policy."  The FFY 2014 Merged Hospital Policy unreasonably caused the

7  Hospitals' DSH inpatient days to be understated because (a) the former subsumed

8  facilities continued to operate as before their acquisitions by the Hospitals, but now

9  as parts of each Hospital, and (b) the subsumed hospital facilities were expected to

10  provide the same amount of uncompensated care as they had before their

11  acquisitions by the Hospitals and actually did so in FFY 2014.

**B.    Response of the Provider Community to the FFY 2014 Merged**
12
**Hospital Policy**
13

14      47.    Shortly after publication of the FFY 2014 IPPS Final Rule, a number of

15  hospitals and a national hospital association, responded to CMS's invitation in the

16  FFY 2014 IPPS Final Rule to provide information on errors in the data published

17  with the Final Rule by disputing the FFY 2014 Merged Hospital Policy.  These

18  entities (a) expressed concern that CMS had not introduced in the FFY 2014

19  Proposed Rule this significant change to long-standing Medicare payment policy

20  concerning merged hospitals and thus had not received meaningful industry input,

21  and (b) recommended that CMS account for the aggregate data of both hospitals in a

22  merger.  As noted in these letters, CMS did not give any indication that it intended

23  to reverse long-standing policy by favoring "new hospitals" that had not accepted

24  assignment of a provider agreement (and did not accept Medicare liabilities) as a

25  result of a sale over hospitals that had merged for Medicare payment purposes

26  where the surviving hospital accepted assignment of the provider agreement

27  (including Medicare liabilities) that was subsumed into the surviving hospital's

28  provider agreement.

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

7576724.1

48.     When CMS issued corrected data in the Federal Register and a related Interim Final Rule with Comment Period on October 3, 2013, the FFY 2014 Merged Hospital Policy, and resulting data, were not corrected or even addressed.  *See* Medicare Program; FFY 2014 Inpatient Prospective Payment Systems: Changes to Certain Cost Reporting Procedures Related to Disproportionate Share Hospital Uncompensated Care Payments, 78 Fed. Reg. 61,191 (Oct. 3, 2013)

49.     CMS's failure to include BMC's data in the calculation of Southern California Hospital at Hollywood's FFY 2014 UC DSH payment caused Southern California Hospital at Hollywood to be underpaid approximately $2,874,443. CMS's failure to include SFMC's data in the calculation of Atlanta Medical Center's FFY 2014 UC DSH payment caused Atlanta Medical Center to be underpaid approximately $4,556,887.

### C.     The FFY 2015 IPPS Rulemakings

50.     In the FFY 2015 IPPS Proposed Rule, CMS noted that it had received additional comments about FFY 2014 Merged Hospital Policy since publication of the FFY 2014 IPPS Final Rule "that suggest using only the surviving CCN produces an estimate of the surviving hospital's uncompensated care burden that is lower than warranted." FFY 2015 IPPS Proposed Rule, 79 Fed. Reg. 27,978, 28,103 (May 15, 2014).  To address that problem, CMS proposed "to incorporate data from both of the hospitals that merged" for purposes of calculating the FFY 2015 UC DSH payment to "improve our estimate of the uncompensated care burden of the merged hospital," effectively reversing the FFY 2014 Merged Hospital Policy.  *Id.*

51.     Thus, for the Factor 3 calculation for FFY 2015, CMS proposed to identify hospitals that merged after the period from which the historical data was drawn but before the publication of each year's IPPS rule.  *Id.*  Once identified, CMS would combine the data from both hospitals (*i.e.*, the most recently available full-year cost reports from the subsumed and surviving CCNs) for purposes of calculating the Factor 3 distribution, which CMS would do until all data for the

HOOPER, LUNDY & BOOKMAN, P.C.
401 9ᵀᴴ STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

7576724.1

merged hospitals would become available under the surviving CCN. *Id.*

52.     Unlike the FFY 2014 IPPS Final Rule's preamble text that lacked clarity on the distinction between transactions where a provider agreement was assigned and those where it was not, CMS offered a methodology that clearly applied to mergers where a hospital assumes the provider agreement of another. CMS defined "merger" as "an acquisition where the Medicare provider agreement of one hospital is subsumed into the provider agreement of the surviving provider." *Id*. CMS stated that it would combine the data of the merged hospitals because the surviving hospital "is subject to all applicable statutes and regulations and to the terms and conditions under which the assigned agreement was originally issued." *Id*.

53.     In the FFY 2015 IPPS Final Rule, CMS adopted the corrected proposed Factor 3 calculation methodology for merged hospitals.  FFY 2015 IPPS Final Rule, 79 Fed. Reg. 49,854, 50,020–22 (Aug. 22, 2014).  But, the agency did not speak to the residual disparity that continued to exist regarding UC DSH payments for FFY 2014 and, thus, did not correct the Hospitals' unlawful FFY 2014 UC DSH payments.

### D.     <u>Procedural Background</u>

54.     The Hospitals timely appealed their FFY 2014 UC-DSH payment and the FFY 2014 Merged Hospital Policy to the PRRB. The PRRB's June 12, 2024 decision dismissed the Hospitals' appeal for lack of jurisdiction because Congress allegedly precluded administrative review of CMS's FFY 2014 Merged Hospital Policy in the Review Preclusion Statute.

55.     This action is being timely commenced within 60 days after the Hospitals' receipt of the PRRB's June 12, 2024 decision. *Id.*

/ / /

/ / /

/ / /

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

**E.** **The PRRB's Decision Is Unlawful and Should Be Reversed with an Order Requiring the Secretary to Recalculate the Hospitals' FFY 2014 UC DSH Payment.**

56.   The PRRB's June 12, 2024 dismissal decision is unlawful because (1) Congress did not (and could not Constitutionally and otherwise) preclude review of an agency policy not lawfully established, and thus *ultra vires*, whether because of procedural flaws or substantive inconsistencies with the underlying substantive statute and/or other authorities, and (2) the Review Preclusion Statute does not preclude the instant challenge to a UC DSH calculation resulting from application of the unlawful FFY 2014 Merged Hospital Policy.

57.   The Review Preclusion Statute facially does not preclude review of every agency action that could affect the UC DSH "estimate" because the statute also precludes review of the selected period.  The preclusion of review of the "period" would be entirely unnecessary if any "estimate" of Factor 3 were shielded from review.  Moreover, the Preclusion Statute does not explicitly preclude review of CMS's FFY 2014 Merged Hospital Policy.

58.   The Hospitals' challenge to CMS's exclusion of inpatient days from the subsumed hospitals when calculating the Hospitals' FFY 2014 UC DSH payments is not a challenge to an "estimate" of the "amount of uncompensated care" because the Hospitals are not challenging the correctness of the estimate of the Hospitals' FFY 2014 UC DSH payment that CMS made using the data from the time period selected in the FFY 2014 IPPS Final Rule.  Rather, the Hospitals are challenging CMS's unexplained, erroneous, and *ultra vires* failure to include the data from the subsumed hospitals in the Hospitals' FFY 2014 UC DSH calculations, which was already set out for the subsumed hospitals in the FFY 2014 IPPS Proposed Rule.  The Review Preclusion Statute did not, and could not, shield CMS's *ultra vires* action from administrative and judicial review and, thus, should be interpreted facially not to preclude the Hospitals' challenge.  Notably, there is no textual or legislative support

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

1  for the proposition that Congress intended to preclude review of *ultra vires* agency

2  action and, as courts have found specifically in the context of Medicare Part A,

3  statutory review preclusion language must clearly apply to the agency action being

4  challenged.

5      59.     Where a court reverses an administrative decision denying jurisdiction

6  in a Medicare payment appeal, the next step often is to remand the matter back to

7  the agency for a decision on the merits of the payment dispute.  Such a remand is

8  inappropriate here because, when dismissing a similar appeal for lack of jurisdiction

9  under the Review Preclusion Statute, the PRRB stated that it lacks the authority to

10  grant the kind of relief sought here.  *In Re DCH Regional Medical Center*, PRRB

11  Case No. 14-2097, Request for Expedited Judicial Review Denied (December 10,

12  2015).  Thus, if this Court were to reverse the PRRB's unlawful jurisdictional

13  dismissal in the instant action and remand the instant action to the Secretary, the

14  Secretary would in turn remand it to the PRRB, which would order "expedited

15  judicial review," thereby causing this action to be back in U.S. District Court

16  without the agency ever having addressed the merits at all.

17      60.     Moreover, if this Court were to reverse the PRRB's unlawful

18  jurisdictional dismissal, CMS has all of the information that it needs to calculate and

19  pay the amount due to the Hospitals and, thus, there are no facts that need to be

20  resolved by the PRRB, making remand futile.  *NLRB v. Wyman-Gordon Co.*, 394

21  U.S. 759, 766, n.6 (1969) (plurality opinion) (Remand to an agency is not proper

22  where it would be "an idle and useless formality" because "[*SEC v. Chenery Corp.*,

23  332 U.S. 194 (1947)] does not require that we convert judicial review of agency

24  action into a ping-pong game.").

25  ///

26  ///

27  ///

28  ///

## CAUSES OF ACTION

## COUNT I

### Violation of the APA and the Medicare Act
### (Decision is Contrary to Law)

61.     The Hospitals hereby incorporate by reference all preceding paragraphs in this Complaint.

62.     The APA prohibits the Secretary from implementing the Medicare Act through actions, findings or conclusions that are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §706(2).  The FFY 2014 Merged Hospital Policy and the Hospitals' FFY 2014 DSH payments are substantively unlawful and should be set aside because they are *ultra vires* and violate the plain meaning of the UC DSH Statute, and otherwise violate the Medicare Act, in that the Secretary calculated that payment without including the subsumed hospitals' data from the time period selected by the Secretary.

63.     The Board improperly relied on the Review Preclusion Statute to dismiss the Hospitals' properly-filed appeal because that Statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

## COUNT II

### Violation of the APA and the Medicare Act
### (Decision is Contrary to Law)

64.     The Hospitals hereby incorporate by reference all preceding paragraphs in this Complaint.

65.     The APA prohibits the Secretary from implementing the Medicare Act through actions, findings or conclusions that are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §706(2).  The FFY 2014 Merged Hospital Policy and the Hospitals' FFY 2014 DSH payments are procedurally unlawful and should be set aside because those payments were calculated using the FFY 2014 Merged Hospital Policy, which the Secretary did not

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

7576724.1

adopt properly under the APA and the Medicare Act.

66.     The FFY 2014 Merged Hospital Policy is procedurally unlawful under the Medicare Act and the APA because, *inter alia*, it (a) was set forth for the first time in the FFY 2014 IPPS Final Rule and was not presented in the FFY 2014 IPPS Proposed Rule or any earlier proposed rule, (b) was not the logical outgrowth of any policy presented in the FFY 2014 IPPS Proposed Rule or any other earlier proposed rule, (c) was not adopted as a regulation through notice-and-comment rulemaking, and (d) deviated from long-standing agency policy without explanation or justification.

67.     Conduct by an agency is considered arbitrary and capricious when it is not explained, or when it is not rationally explained.  The Secretary did not justify the FFY 2014 Merged Hospital Policy, which conflicted with previous policies and which the Secretary abandoned in FFY 2015, but without correcting the unlawful FFY 2014 UC DSH payments made under that policy.

68.     The Board improperly relied on the Review Preclusion Statute to dismiss the Hospitals' properly-filed appeal because that Statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

## COUNT III

### Violation of the APA
### (Agency Action Unsupported by the Evidence in the Record)

69.     The Hospitals hereby incorporate by reference all preceding paragraphs in this Complaint.

70.     The FFY 2014 Merged Hospital Policy and the Hospitals' DSH payment are unlawful and should be set aside because they are unsupported by substantial evidence in the record.

71.     The Board improperly relied on the Review Preclusion Statute to dismiss the Hospitals' properly-filed appeal because that Statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL (202) 580-7700 • FAX (202) 609-8931

7576724.1

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

## COUNT IV

## Mandamus

72.     The Hospitals hereby incorporate by reference all preceding paragraphs in this Complaint.

73.     The Secretary has the non-discretionary duty to (a) reimburse the Hospitals fully at the amounts to which they are entitled under the law, (b) apply policies that are substantively and/or procedurally valid, and (c) avoid imposing policies that substantively and/or procedurally ultra vires.  The Hospitals are entitled to a writ of mandamus under 28 U.S.C. §1361 invalidating the FFY 2014 Merged Hospital Policy and directing the Secretary to recalculate the Hospitals' FFY 2014 UC DSH payments after including the subsumed hospitals' data.  The Review Preclusion Statute does not apply to mandamus actions and, even if it this Court were to find that it does, that statute does not, and could not, preclude review of *ultra vires* agency action, whether substantive or procedural.

## COUNT V

## All Writs Act

74.     The Hospitals hereby incorporate by reference all preceding paragraphs in this Complaint.

75.     The Secretary violated the Medicare Act and APA, and acted ultra vires, by applying the FFY 2014 Merged Hospital Policy and calculating the Hospitals' FFY 2014 UC DSH payments without including the subsumed hospitals' historical data.  Under the All Writs Act, 28 U.S.C. §1651, and other authority, the Hospitals are entitled to issuance of an order invalidating the FFY 2014 Merged Hospital Policy and requiring the Secretary to recalculate the Hospitals' FFY 2014 UC DSH payments after including the subsumed hospitals' historical data.

## COUNT VI

## United States Constitution – Separation of Powers and Due Process Clauses

76.     The Hospitals hereby incorporate by reference all preceding paragraphs

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

1   in this Complaint.

2   77.   The Secretary's FFY 2014 Merged Hospital Policy and failure to

3   calculate the Hospitals' FFY 2014 UC DSH payments without including the

4   subsumed hospitals' historical data were substantively and procedurally unlawful

5   under the Medicare Act and the APA.  Thus, to the extent that the Review

6   Preclusion Statute must be interpreted to prelude the Hospitals' claims challenging

7   the FFY 2014 Merged Hospital Policy and their FFY 2014 UC DSH payments

8   calculated thereunder (which interpretation the Hospitals believe is incorrect), then

9   the Review Preclusion Statute unlawfully insulates the Secretary's determination of

10   UC DSH payments from all judicial review in violation of the separation of powers

11   and due process clauses of the United States Constitution, and other authorities.

12   Accordingly, the Court should (a) set aside the Review Preclusion Statute as

13   unconstitutional (b) reverse the PRRB's June 12, 2024 jurisdictional dismissal, and

14   (c) rule in favor of the Hospitals on their claims challenging the substantive and

15   procedural validity of the FFY 2014 Merged Hospital Policy and the Hospitals' FFY

16   2014 UC DSH payments determined thereunder.

17   <u>**REQUEST FOR RELIEF**</u>

18   WHEREFORE, the Hospitals respectfully request:

19   1.   An order reversing the PRRB's June 12, 2024 adverse jurisdictional

20   decision;

21   2.   An order instructing the Secretary and the PRRB to reinstate the

22   Hospitals' FFY 2014 UC DSH appeal;

23   3.   An order vacating and invalidating the FFY 2014 Merged Hospital

24   Policy;

25   4.   An order instructing the Secretary to recalculate the Hospitals' FFY

26   2014 UC DSH payments after including the subsumed hospitals' data, and pay the

27   Hospitals the additional amount due, with interest calculated in accordance with 42

28   U.S.C. §1395oo(f)(2);

7576724.1

5.      The issuance of a writ of mandamus, after invalidating the FFY 2014 Merged Hospital Policy, requiring the Secretary to (a) order the PRRB to accept jurisdiction over the Hospitals' FFY 2014 UC DSH challenge and (b) recalculate the Hospitals' FFY 2014 UC DSH payments after including the subsumed hospitals' data, and pay the Hospitals the additional amount due, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

6.      An order that the Court shall retain jurisdiction over this action for purposes of enforcement until notice from the Hospitals of the Secretary's compliance with this Court's orders;

7.      Legal fees and costs of suit incurred by the Hospitals;

8.      An award of interest as required by 42 U.S.C. §1395oo(f)(2); and

9.      Such other relief as this Court may consider appropriate.

DATED:  August 8, 2024              HOOPER, LUNDY & BOOKMAN, P.C.


By:      *s/Katrina A. Pagonis*
                KATRINA A. PAGONIS
                SVEN C. COLLINS
                KELLY A. CARROLL
                ROBERT L. ROTH
Attorneys for Plaintiffs

HOOPER, LUNDY & BOOKMAN, P.C.
401 9TH STREET, NW, SUITE 550
WASHINGTON, D.C. 20004
TEL. (202) 580-7700 • FAX (202) 609-8931

7576724.1